## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ | : **CASE No. 3:01CV02426 (CFD)** |
| | : |
| **ANDREA HOGAN,** | : |
| **Plaintiff,** | : **April 5, 2004** |
| **Vs.** | : |
| | : |
| **ALLEGIANCE CORPORATION, and** | : |
| **MEDLINE INDUSTRIES, INC.** | : |
| **Defendants.** | : |
| _____ | : |

### JOINT REPORT

The parties submit the following Report, as required by the Court's Order dated March 2, 2004.

    **A.**    **Nature of the Case:**

This is a product liability case, in which Plaintiff claims injuries and damages due to an alleged allergy to natural rubber latex. Defendants are alleged to be manufacturers or distributors of natural rubber latex gloves, which Plaintiff claims she used or to which she was otherwise exposed to in her healthcare profession.

This action is one of many which were transferred to the United States District Court for the Eastern District of Pennsylvania (Ludwig, J.) by the Judicial Panel on Multidistrict Litigation, MDL 1148. This action has now been remanded back to this Court, and a copy of Judge Ludwig's Remand Order is attached, explaining what has been done in the MDL proceedings and what remains for the §1407 transferor court to do. Also attached as Exhibits 1 and 2 are the standard Overview for the Transferor Court and the template often utilized by the Transferor Court for scheduling purposes after remand.

During the MDL proceedings, all disclosures called for under Fed. R. Civ. P. 26 (a) (1) were concluded by court ordered discovery proceedings, except for plaintiff's version under Fed. R. Civ. P. 26 (a) (1) (C) of damage computations. After remand, the plaintiff's deposition was taken, as well as several of her health care providers in the pre-December 28, 1998, period. Several more of plaintiff's health care providers prior to December 28, 1998, remain to be deposed. Product Identification materials are being assembled by plaintiff Intervenor Stamford Hospital.

        **B.**        **Factual and Legal Issues in Dispute:**

**Plaintiff**

Plaintiff, Andrea Hogan claims she worked as a health care worker where she was exposed to latex gloves manufactured, sold, and/or distributed by the Defendants. She was allegedly diagnosed with Type I latex allergy. Plaintiff claims permanent ill health effects, emotional distress and lost earnings. Plaintiff claims that Defendants altered their processes for manufacturing latex glove products in the 1980's when production requirements increased and that Defendants either failed to perform adequate testing or performed adequate testing and ignored the dangerous results. Plaintiff claims that Defendant knew or should have known of the defects in their latex glove products. Despite this knowledge, Defendants allegedly continued to design, market and manufacture allegedly defective latex glove products without disclosing the dangers that they knew or should have known existed. Plaintiff further claims that Defendants made misrepresentations regarding the safety of their products to Plaintiff and Plaintiff's employers. Plaintiff allegedly relied on and was induced by these misrepresentations to use Defendants' allegedly unsafe product.

Plaintiff's Complaint contains the following claims: negligence; strict liability in tort,

failure to warn, breach of express and implied warranty; negligent misrepresentation; and fraudulent misrepresentation. All claims are expressly brought under the Connecticut Products Liability Statute. Due to the injuries suffered by Plaintiff as a result of this allergy, Stamford Hospital has paid a total of $137,118.99 to date in workers' compensation benefits to or on behalf of Plaintiff, who was acting within the scope of her employment when she was exposed. Pursuant to Conn. Gen. Statutes Section 31-293, Stamford Hospital is entitled to reimbursement of its lien, which represents benefits paid to date and the present value of future benefits, from the proceeds of this case.

**<u>Defendant</u>**

On a case specific pre-trial basis, the paramount substantive dispositive issue is plaintiff's compliance with Connecticut's three year statute of limitations. This action was filed in this Court on December 28, 2001. Prior to December 28, 1998, plaintiff had received clear-cut diagnoses of her latex allergy by her health care providers, and, prior to December 28, 1998, various medical records indicate that plaintiff was reporting her latex allergy to about six (6) of her other health care providers, including medical records in plaintiff's handwriting, e.g. patient questionnaires. By far, the most specific latex allergy diagnosis, supported by latex allergy serum testing results yielding a "high" classification, was done by Intervenor Stamford Hospital in September 1997. Stamford Hospital informed plaintiff in September 1997 to carry an EPIPEN in the event she experienced deadly latex allergy anaphylaxis, endangering her life, and to carry latex allergic medical alert identification to notify and alert emergency room personnel of her latex allergy in the event she were unable to do so.

    C.      **<u>Jurisdictional Basis of the Case:</u>**

This matter appears to be properly before the Court based on diversity jurisdiction, pursuant to 28 USC § 1332.

**D.      Parties Not Served:**

All parties have been served in this case.

**E.      Parties Not Subject to the Court's Jurisdiction:**

The parties are not aware of any personal jurisdictional issues.

**F.      Further Dispositive or Partially Dispositive Motions:**

**Plaintiff**

The Plaintiff is not in a position to evaluate whether any dispositive motions are warranted and reserve the right to bring such motions, should discovery disclose appropriate bases.

**Defendant**

The Defendants anticipate a dispositive motion based on the applicable statute of limitations and a dispositive motion based on lack of product identification concerning defendant Allegiance.

**G.      Suitability for Reference to Arbitration, Master, or Magistrate for Trial:**

**Plaintiff**

Mediation is appropriate at this time.

**Defendant**

The Defendants do not consent to mediation and believe this matter will be quickly resolved through dispositive motions.

**H.      Status of Related Cases Pending Before Court or Other Courts:**

4

**Plaintiff**

To Plaintiff's knowledge, there is one other natural rubber latex allergy case pending in the District of Connecticut against these Defendants and others.

**Defendant**

The Defendants refer the Court to the attached Exhibit 1, which provides an Overview prepared by the Defendants of the natural rubber latex litigation and related MDL proceedings.  **I. Proposed Deadline for Discovery:**

**Plaintiff**

The parties propose the discovery schedule attached as Exhibit 2 in this case.

**Defendant**

Due to the number of the plaintiff's health care providers both before and after December 28, 1998, the Defendants request an increase in the number of permitted depositions from ten to twenty at this time.

Defendants request that a cut-off be imposed to require plaintiffs to present evidence into the record on:

a.    Compliance with the statute of limitations; and,

b.    Product identification evidence applicable to defendant Allegiance.

In addition to deposing the plaintiff's many health care providers and some of her co-workers, the Defendants will be conducting IME's with respect to allergy/immunology, dermatology, pulmonology and psychiatry.  In addition, examinations will be requested on plaintiff's earning potential and health care work availability.

The Defendants request a one year discovery cut off.

**J.      Estimated Length of Trial:**

The parties estimate that the trial of this matter will take ten (10) to fourteen (14) trial days.

**K.      Whether Jury Trial Requested:**

Plaintiff demanded a jury trial in this case.

**L.      Prospects for Settlement:**

**Plaintiff**

The parties will be in a position to address settlement once merits discovery closes or, during the mediation contemplated above.

**Defendant**

The parties have yet to discuss settlement because of dispositive issues (statute of limitations and product identification) and regardless, are presently too far apart for a prompt settlement or resolution of the case.

**M.      Complex Issues:**

The parties are not aware of any other complex issues; however, the parties will supplement this information should future circumstances warrant.

Dated: March 31, 2004

TIBBETTS KEATING & BUTLER, LLC                LoRICCO, TROTTA & LoRICCO


By _____ /s/ Timothy F. Butler _____        By _____ /s/ Frederick Joseph Trotta ____
       Timothy F. Butler (CT 15537)                    Frederick Joseph Trotta
       43 Corbin Drive                                        216 Crown Street, LoRicco
Towers
       Darien, CT 06820                                Suite 502
       203-656-1066                                    New Haven, CT 06510
       Attorneys for Plaintiff                         203-865-3123
                                                       Attorneys for Medline Industries


HOWD & LUDORF                                   LETIZIA, AMBROSE & COHEN


By_____ /s/ John J. Bogdanski _____           By _____ /s/ Anne K. Millham _____
       John J. Bogdanski                               Anne K. Millham
       65 Wethersfield Ave.                            One Church Street
       Hartford, CT 06114-1190                         New Haven, CT 06510
       860-249-1361                                    203-787-7000
       Attorneys for Allegiance Corporation            Attorneys for Stamford Hospital

7

**CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail, to the following counsel of record this 5th day of April, 2004.

Timothy F. Butler, Esquire
Tibbetts, Keating & Butler, LLC
43 Corbin Drive
Darien, CT  06820

Frederick J. Trotta, Sr., Esquire
LoRicco Trotta & LoRicco, LLC
LoRicco Tower
216 Crown Street
New Haven, CT  06510

Anne K. Millham, Esquire
Letizia, Ambrose & Falls
One Church Street
New Haven, CT  06510

_____    ____/s/ John J. Bogdanski_____
John J. Bogdanski

**Exhibit 1**

***NATURAL RUBBER LATEX ALLERGY: OVERVIEW FOR THE TRANSFEROR COURT***

**Background**

**A.      Natural Rubber Latex Gloves**

Natural rubber latex gloves (sometimes "NRL gloves") are used by millions of healthcare workers each year to defend against viruses and diseases such as HIV and Hepatitis. Natural rubber latex is viewed as a material of choice for medical gloves because of its strong barrier qualities and tactile sensitivity.

Healthcare workers have used natural rubber latex gloves for decades.  NRL is derived from the sap of the rubber tree whose scientific name is *hevea brasiliensis*.  NRL is ubiquitous, both in medical and non medical environments.  It has been estimated that there are up to 40,000 different consumer products that contain NRL, including condoms, toys, tires, rubber bands, rubber balls, balloons, household and gardening gloves, pacifiers, racket handles, and other sporting equipment.

In 1987, due to increased concerns over AIDS and Hepatitis B, the Centers for Disease Control ("CDC") officially recognized the need for high quality barrier protection for healthcare workers and their patients to control the spread of infectious diseases and blood borne pathogens.  CDC developed a set of guidelines called Universal Precautions.  OSHA implemented these guidelines by requiring that healthcare workers use gloves made of material with the barrier protection qualities of NRL whenever they come into physical contact with a patient or handle bodily fluids.  This practice of "gloving" was mandatory.

In approximately 1989, FDA began receiving reports regarding possible NRL allergic

9

reactions. As a result, on March 29, 1991, the FDA Commissioner's Office issued a Medical Alert to over one million healthcare workers and professionals in the U.S. referring to the increased reports of allergic reactions to NRL containing medical devices and to reports of NRL sensitivity in the medical literature. FDA advised healthcare professionals to identify their natural rubber latex sensitive patients and to be ready to treat allergic reactions promptly. Soon after sending out this Medical Alert, FDA circulated virtually the same information in its July 1991 Medical Bulletin. The Bulletin was sent to over one million hospitals, doctors, nurses, and other healthcare professionals. Those recipients in turn re-copied and further distributed the Alerts, increasing circulation exponentially.

**B.     Allergy**

The immune process (by which one acquires an allergy) and the spectrum of allergic symptoms is the same for all allergens whether they are fruit or pollen or grass or NRL or anything else. Therefore, it is appropriate to begin with an overview of allergy, albeit with this caution: Allergy is a complex subject, every individual is unique, and the state of knowledge is constantly evolving. The following is a brief overview:

**1.     IgE antibody - The immune cells responsible for Type I allergy**

The immune system protects us from disease by creating antibodies that fight off and kill viruses and bacteria and other foreign (non-self) substances. The antibodies involved in allergy are called IgE antibodies. It is paradoxical that IgE, an antibody of the immune system designed to protect us, should be responsible for allergy. In evolutionary history, IgE antibodies developed as specialists to fight worms and other parasites that found their way into the human body. In developed countries, where parasites have been virtually eliminated, IgE antibodies

10

unfortunately turned to mischief - that is, causing allergy. In undeveloped countries, where IgE antibodies are still busy protecting humans against parasites, there is coincidentally very little allergy.

2.      **From sensitization to allergy**

A process called "sensitization" must take place before one can become allergic (that is, express allergic symptoms). The process is complex and beyond the scope of this overview; however, if sensitization occurs, it results in the proliferation of IgE (immunoglobulin E) antibodies. Sensitization can be defined for our purposes as the presence of IgE antibodies specific to a particular allergen in a human's blood, as measured either by positive skin prick test or positive blood serum test.

It may take one or more re-exposures by the individual to the same allergen before sensitization occurs. It should be noted, however, that most humans are exposed to many kinds of allergens on a daily basis, yet never become sensitized. Even with the small percentage of humans who do become sensitized, the number of re-exposures before sensitization occurs varies, and there is no known threshold for sensitization to allergens. Moreover, many humans, despite being "sensitized" to an allergen (that is, having IgE specific to that allergen present in their blood), will never have an allergic reaction. However, a small percentage of humans, once sensitization occurs, may thereafter experience an allergic reaction after re-exposure to the allergen. That person is considered to have an allergy. Thus, allergy only occurs in humans who are

hypersensitive to specific allergens. An allergic reaction can produce a variety of symptoms such as a rash, allergic rhinitis (runny nose), urticaria (hives), asthma, and other symptoms. In sum, for "allergy" to occur in a human, there must, first, be exposure to an allergen; there must, second, be production of IgE specific to that allergen in the human's blood, and there must, third, be an allergic reaction by the human to a subsequent exposure to that allergen.

### 3.        Type I allergy v. Type IV allergy

Allergy is a hypersensitive (super sensitive) immune cell reaction to an otherwise benign or harmless substance. In fact, the type of allergic reaction we are concerned with here is called Immediate Type <u>Hypersensitivity</u> (ITH), Type I <u>Hypersensitivity,</u> or IgE mediated hypersensitivity. The substances causing ITH for the most part are proteins such as those in dog dander or pollen. Not all proteins in dog dander or pollen or any other substance are capable of causing allergy. Allergenic proteins derived from plants and trees vary in their allergenicity depending, *inter alia*, on the season and growing conditions (*e.g.* amount of water). Most people will not react to allergens at all. A person can be allergic to one allergen and not to others. It is well recognized that allergy has a major genetic component and certain individuals tend to be allergic to many things. These people are called *atopics*.

The allergic symptoms of an ITH or Type I reaction can vary greatly depending upon the individual's susceptibility or predisposition to the specific allergen and the route of exposure (e.g., cutaneous, mucosal, or respiratory). Symptoms can range from localized hives (urticaria) to more severe generalized urticaria. More severe reactions may include gastrointestinal and respiratory distress.

12

Many allergens look somewhat alike to the immune system. Thus, a person may be allergic to one allergen and then be exposed to another similarly configured protein to which they are not allergic, yet the body is fooled by their molecular similarity into reacting. This is known as *cross reactivity*. Some substances which are not allergens or cross-reacting allergens, say an ingredient in food (or a chemical in the air) may trigger a reaction resembling an allergic reaction (*i.e.*, a release of histamine — a substance which causes allergic symptoms). These are known as non-specific (non-allergenic) stimulators.

In addition to Immediate Type Hypersensitivity (or Type I IgE mediated hypersensitivity) there are other types of allergy. One is called Delayed Type Hypersensitivity or DTH, also known as Type IV hypersensitivity. These types derive their names from the time it takes from exposure to reaction. A Type I allergic response usually occurs approximately 20 minutes after exposure whereas a Type IV reaction typically occurs 24-48 hours after exposure. DTH is caused by T cells whereas, as previously noted, ITH (or Type I) is caused by antibodies which are proteins made by

B cells. T cells and IgE react to different allergens. The allergic reaction they cause can lead to both similar and distinct allergic symptoms. The Type IV reactions are usually confined to local areas (as compared to the sometimes more systemic Type I reaction) and may include redness, swelling, or edema. Poison ivy is a classic example of a Type IV reaction.

There are also different diagnostic tests for the various types of hypersensitivity reactions. In the diagnosis of natural rubber latex allergy, the first issue is whether individuals are sensitized, and then whether they have allergy at all and, if so, whether it is Type I or Type IV. In these cases, all plaintiffs allege Type I immediate hypersensitivity.

### 4.      Diagnosis of allergy

Diagnosis of allergy depends on positive lab (blood or *in vitro*) or skin (*in vivo*) testing for sensitization and a thorough history demonstrating verifiable exposure and timely expression of allergic symptoms.  Since every person is continuously exposed to allergens from the time of birth, obtaining an accurate exposure history can be difficult.  Exposures that do not result in allergic symptoms, including those which may be leading to sensitization, are perceived as harmless non-events and go unnoticed and unremarked.  As noted, all ITH allergies cause the same symptoms and many allergic people are atopic meaning that they are genetically predisposed to become allergic, after exposure to allergens.  Numerous exposures to allergens occur simultaneously.  Further, many symptoms that humans experience are non-specific to allergy further complicating diagnosis.  The tests for sensitization are also subject to false positive and negative results.  False positives can be caused, among other things, by cross-reactions.

### C.      Latex Allergies

Healthcare workers have reported two types of reactions to NRL gloves which are unrelated to natural rubber proteins.  The first type of reaction is irritant contact dermatitis (sometimes caused by constant hand washing), which is a non-allergic reaction that does not involve cells of the immune system.  The second type of reaction is, as discussed above, allergic contact dermatitis or Type IV delayed hypersensitivity and refers to a local allergic reaction (similar to poison ivy) to the chemicals used in the manufacturing process.  Both of these reactions can be confused with ITH skin symptoms.

14

D.        **NRL Glove Litigation**

The first product liability case alleging NRL allergy resulting from the use of NRL medical gloves was filed in or about 1991.  Since that date, there have been hundreds of state and federal latex glove lawsuits filed.

The plaintiffs in these cases claim that they have developed NRL allergies from exposure to NRL medical gloves (or, more particularly, to certain potentially allergenic latex proteins in the gloves).  Plaintiffs typically allege that, over time, they first become sensitized to NRL as a result of repeated exposure to NRL gloves.  They also claim that they then experience allergic reactions on subsequent re-exposure to NRL gloves or other NRL products.  In one case a plaintiff, who had never had a reaction to NRL gloves, alleged that an allergic reaction to a nectarine was really a "cross-reaction" to NRL. (*Bruggencate* identified in the chart *infra*).  Some plaintiffs allege that they are so allergic to NRL that they can no longer work in the healthcare field due to the widespread use of NRL gloves and other NRL products.  Other plaintiffs have continued to work in healthcare, using non-NRL gloves, glove liners, or other accommodations. There are also allegations by some plaintiffs that as a result of their NRL allergy, they must avoid common household NRL-containing products and be vigilant for NRL products when they leave their homes.

Plaintiffs variously allege manufacturing and design defects and failure to warn theories.  The defendants typically assert the following defenses: plaintiff does not have Type I NRL allergy; lack of general causation; lack of specific causation (which is the probability that the exposure to a particular defendant's gloves caused injury to the individual plaintiff); lack of product defect; education of healthcare workers regarding NRL allergies; assumption of the risk;

15

comparative negligence; statute of limitations; state of the art; and, as in other allergies, the sufficiency of the labeling and plaintiffs' knowledge that they were using NRL gloves.. Healthcare workers are sophisticated users and consumers of NRL gloves, and information about the perceived, developing NRL allergy problem was communicated to them through many sources including FDA bulletins, nurse association communications, medical journals and various task forces formed by hospitals. Healthcare workers were also schooled on recognizing and dealing with NRL allergy because it was also an important element in providing adequate healthcare to patients. Moreover, in dealing with allergy issues, warnings on a product about the possibility of sensitization are not effective (*i.e.* cannot be heeded) because there is nothing that one can do until one knows one is actually allergic.

**Trial History**

| Plaintiff | State | Trial Date | Outcome |
|---|---|---|---|
| *Kummel v. Smith & Nephew* | NJ | June 1997 | Defense Verdict |
| *Green, et al. v. Smith & Nephew, et al.* | WI | Feb. 1998 | Plaintiff Verdict |
| *Bruggencate v. Baxter Healthcare Corporation, et al.* | CA | April 2000 | Voluntarily Dismissed with Prejudice in mid-trial |
| *McGinnis v. Baxter Healthcare Corporation, et al.* | CA | June 2000 | Defense JNOV - Affirmed on Appeal |
| *Zarnosky v. Smith & Nephew* | NJ | September 2000 | Defense Verdict |
| *Goolsby v. Baxter Healthcare Corporation* | TX | March 2001 | Plaintiff Verdict |
| *Turacy v. Tradex Int'l., Inc.* | OH | May 2001 | Defense Verdict |
| *Gonoude v. Baxter Healthcare Corporation, et al.* | PA | May 2001 | Settled at Trial |
| *Falcone v. Safeskin Corporation* | PA | September 2001 | Plaintiff Verdict |
| *Steffen v. Johnson & Johnson, et al.* | TX | October 2001 | Defense Verdict |
| *Langlois and Borazzas (consolidated)* | NH | March 2002 | Defense Verdicts |
| *Kennedy v. Baxter Healthcare Corporation, et al.* | MN | April 2002 | Defense Verdict |
| *Patzek v. Aladan Corporation, et al.* | PA | July 2002 | Defense Verdict |
| *Rourke-Nichols v. Baxter Healthcare Corporation, et al.* | CA | October 2002 | Defense Verdict |
| *Gilberti v. Touro Infirmary, et al.* | LA | February 2003 | Defense Verdict |
| *Sinrod v. Smith & Nephew, et al.* | NY | September 2003 | Plaintiff Verdict $150,000 |

17

There have been a total of seventeen (17) cases that have started trial. One (1) case was settled during trial, one (1) case was dismissed by plaintiff after several trial days with no payment, and there were fifteen (15) dispositions by jury verdict. One (1) jury verdict for the plaintiff was vacated by JNOV and affirmed on appeal. The current tally is eleven (11) dispositions in favor of the defense and four (4) for plaintiffs. The last eight (8) trials have resulted in seven (7) defense verdicts and one in favor of plaintiff.

**Remaining Discovery**

Since 1991, hundreds of plaintiffs have filed NRL glove allergy cases in state and federal courts throughout the United States against many companies that have manufactured and distributed NRL gloves during the past several decades. Inherent in each case are questions relating to product identification, presence or absence of Type I NRL allergy, general causation, specific causation, product defect, warnings, and damages. The MDL Court left the bulk of discovery on these issues for post-remand discovery, and many of the verdicts in this litigation were based on these case specific issues. The NRL glove litigation involves complex scientific and medical issues. Extensive case-specific expert testimony will be needed in each case. Other than general background testimony about NRL allergies and general medical and scientific research, most of the case-specific expert testimony will address the detailed medical and exposure history of each plaintiff in an effort to prove or disprove that the plaintiff has Type I NRL allergy at all (or that the plaintiff became sensitized as a result of exposure to defendants' latex gloves).

Post-remand discovery is also needed in order to focus on the identity of the glove products used by each plaintiff.  (Each manufacturer offers a variety of models in the surgical and exam glove markets that vary as to color, feel, use of powder, use of synthetic materials, sterility, packaging and other characteristics).  Such discovery must also address the plaintiff's medical history, records and tests to determine the presence or absence of allergy and the substances to which plaintiff is allergic.

NRL is commonly used in countless household products, not simply in the healthcare setting.  This raises the possibility that NRL allergies (if any) were caused by other products and not NRL gloves.  Also, allergic reactions may be caused by cross-reactivity between NRL proteins and other structurally similar allergens, for example, certain foods and grasses where the plaintiff is actually allergic to those substances and not to natural rubber.  Depositions of non-party witnesses, including, but not limited to plaintiffs' co-workers and supervisors, need to be taken.  These witnesses are crucial to product identification, causation, and damage issues.  Damages discovery is particularly important because plaintiffs sometimes claim inability to work or restriction from working in their profession.  Discovery involves an exploration of damage mitigation issues and an investigation of accessible hospitals or other facilities since there are many institutions that provide NRL powder-free and NRL-free environments.

In addition, most plaintiffs continue to seek treatment from healthcare providers and continue to change occupations.  Thus, even in cases where some discovery has occurred, additional discovery is needed to obtain up-to-date medical, employment, education, insurance, and tax information.

**Exhibit 2**

**CASE MANAGEMENT ORDER GOVERNING POST REMAND**

**DISCOVERY**

Beginning in the mid-1990s, a small number of healthcare workers filed individual lawsuits against manufacturers and distributors of natural rubber latex (NRL) gloves, seeking damages for claimed Type I allergic reactions allegedly developed from use of and exposure to NRL gloves in their respective professions.  On March 10, 1997, the Judicial Panel for Multi District Litigation initially transferred thirteen (13) federal NRL cases to the Honorable Edmund V. Ludwig of the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1407, and all subsequently filed or removed federal NRL cases were similarly transferred.

Extensive discovery of defendants ensued, involving numerous 30(b)(6) depositions, voluminous corporate document production, and written discovery.  On September 16, 2002, Judge Ludwig filed an Order of Suggestion of Remand.  Pursuant to that Order, the Court created six (6) Remand Groups, each with its own remand date. Those groups included essentially one hundred (100) cases to be remanded per month, with the first remand set for October 31, 2002, and a final remand date of March 31, 2003. Judge Ludwig's Order provided for "pre-remand" discovery of up to twenty two (22) deposition hours pre-remand in each case, with a maximum of twelve (12) hours for the plaintiff's deposition and ten (10) hours for other significant depositions, with further case-specific discovery as determined by the respective transferor courts.

20

This case has been remanded to the United States District Court for the District of Connecticut, and this Court has determined that the case should be governed for pre-trial purposes by a Case Management Order. The objective of this Case Management Order is to schedule certain case specific discovery in accordance with Fed. R. Civ. P. 16 and as contemplated by the Order of Suggestion of Remand at 8, which was agreed to by the parties.

**WHEREFORE,** it is on this _____ day of _____, 2004,

**ORDERED that**

1.      **Discovery Start Date**.  All discovery deadlines set forth below shall be measured by the discovery start date, as follows: March 11, 2004.

Prior to the Discovery Start Date, the parties can continue to engage in: (1) records collection; and (2) completion of remaining pre remand discovery permitted in the MDL, including a twelve (12) hour deposition of plaintiff and ten (10) hours of other depositions, as provided by Judge Ludwig's Order.

2.      **Updated Authorizations**.  To the extent not previously provided, within fourteen (14) days of the Discovery Start Date, plaintiff will provide defendants with executed authorizations to permit defendants to obtain updated medical, employment, social security, health insurance, income tax, and other related records.

3.      **Product Identification**. Product identification discovery has been completed.

4.      **Written Discovery**.  All written discovery and production of documents regarding defendants to be served within 180 days of the discovery start date.

5.      **Plaintiff(s) Deposition(s)**.  Plaintiff's deposition has been completed.

6.    **Defendant's Deposition(s)**.  Defendants' depositions shall be completed within 270 days of the discovery start date.

7.    **Merits Depositions**.  Depositions of non party witnesses, including but not limited to plaintiff's co workers, supervisors, family, and friends, shall be completed by close of discovery.

8.    **Alternative Dispute Resolution**.  Upon the conclusion of Merits Depositions, unless agreed earlier, the parties will meet and confer regarding the appropriateness of and options for alternative dispute resolution.

9.    **Plaintiff's Expert Designations**.  Plaintiff shall serve all generic and case specific expert designations and expert reports (in the form and manner set forth in MDL CMO No. 53, entered on November 5, 1999), together with all disclosures pursuant to Fed. R. Civ. P. 26(a)(2), no later than one hundred and twenty (120) days from the Discovery Start Date.

10.    **IMEs**.  All IMEs are to be completed no later than one hundred and sixty five (165) days after the Discovery Start Date (forty five (45) days after the deadline for plaintiffs to serve expert designations and reports).

11.    **Defendants' Expert Designations**.  Defendants shall serve all generic and case specific expert designations and expert reports including IME reports (in the form and manner set forth in MDL CMO No. 53, entered on November 5, 1999), together with all disclosures pursuant to Fed. R. Civ. P. 26(a)(2), no later than one hundred and eighty (180) days after the Discovery Start Date (sixty (60) days after plaintiff's deadline to serve expert designations and reports).

12.    **Depositions of Plaintiff's Experts**.  Depositions of plaintiff's case specific experts are to be completed no later than one hundred and fifty (150) days after the Discovery Start Date (thirty (30) days after plaintiff's deadline to serve expert designations, reports and Rule 26(a)(2) disclosures).  All generic experts were disclosed and deposed in the MDL.

13.    **Depositions of Defendants' Experts**.  Depositions of defendants' case specific experts are to be completed no later than two hundred and ten (210) days after the Discovery Start Date (thirty (30) days after defendants' deadline to serve expert designations, reports and Rule 26(a)(2) disclosures).  All generic experts were disclosed and deposed in the MDL.

14.    **Requests for Admissions**.  Any party may serve Requests for Admissions no later than two hundred and thirty (230) days after the Discovery Start Date (twenty (20) days after completion of depositions of all case specific experts).  Responses to Requests for Admission, including objections, shall be served no later than thirty (30) days after service, in accordance with Fed. R. Civ. P. 36(a).

15.    **Dispositive Motions**.  All dispositive motions shall be filed no later than two hundred and eighty (280) days after the Discovery Start Date (twenty (20) days after completion of discovery), with opposition papers to be filed and served no later than thirty (30) days after receipt of each motion.  Reply papers, if any, shall be filed and served no later than ten (10) days after receipt of any opposition.

23

16.    **Venue Motions**.  Defendants may file and serve a motion to change venue no later than one hundred and fifty (150) days from the Discovery Start Date (thirty (30) days after completion of Merits Depositions).

17.    **Pre Trial Conferences/Trial Call**.  At the conclusion of merits and expert discovery, the Court shall schedule a pre trial conference.  At that conference, the Court will set a schedule for all remaining pre trial matters and will set a trial date.

BY THE COURT

_____

Christopher F. Droney, U.S.D.J.